

19 JUL 22 PM 3: 23

ALLEGHENY COUNTY
DISTRICT ATTORNEY'S OFFICE

RECEIVED

JUL 22 2019

JUDGE RANDY TODD



IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | CRIMINAL DIVISION |
| v. | CC: 2017-08906 |
| TODD ROBINSON<br>DEFENDANT | JUDGE RANDAL TODD |
| | Trial/Status Date:  August 15, 2019 |

## DEFENSE BRIEF IN SUPPORT OF OMNIBUS PRE-TRIAL MOTIONS

AND NOW, comes the Defendant, TODD ROBINSON, by and through his attorney, Patrick A. Sweeney, Trial Counsel, of the Allegheny County Office of the Public Defender, who files this Brief in support of the Pre-Trial Motions (Amended), originally filed on May 7, 2018, and amended April 8, 2019.

1. Several of the issues raised in the Omnibus Pre-Trial Motions were resolved on previous court listings (April 8, 2019 and July 11, 2019), including:

    a. Part I (Petition for Writ of Habeas Corpus, made moot by the Commonwealth's concession that the Aggravated Assault counts (18 Pa.C.S. §2702 §§A2) were not supported by the evidence, resulting in the Commonwealth amending the Criminal Information to make Counts 1 and 2 Aggravated Assault by Physical

Respondents' Exhibit 18

Menace (18 Pa.C.S. §2702 §§A6);

   b.  Part IV (Motion for Severance, which was granted as to the Person Not to Possess a Firearm count (18 Pa.C.S. §6105 §§A1);

   c.  Part V, Motion in Limine (granted with the qualification that certain circumstances at trial may make the Defendant's prior convictions relevant);

   d.  Part VI, Motion for Discovery and Inspection (granted and resolved, with respect to the clothing recovered from the Defendant following his arrest).

2.  Following argument on July 11, 2019, the outstanding issues that remain were raised in Part II (Motion to Dismiss) and Part III (Motion to Suppress Evidence).

3.  On July 11, 2019, the Preliminary Hearing Transcript, as well as photographs from the crime scene, of the Defendant's clothing, and of the Defendant's wounds (Defense Exhibits A & B) were entered into evidence for the purposes of arguing the Pre-Trial Motions.

4.  This Honorable Court directed the Defense to file a response brief by July 22, 2019 addressing those issues.

## II.  MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

1.  The averments of paragraphs 1 through 9 under the heading of the Petition for Writ of Habeas Corpus (filed on April 8, 2019) are incorporated by reference hearing.

   a.  Following the initial encounter with Mr. Robinson and his release from that encounter, the Wilkinsburg officers learned from County Index that Mr. Robinson was wanted on an active parole warrant and began to search the area for the vehicle he was driving. (Preliminary Hearing Transcript at p8).

Respondents' Exhibit 18

b. Approximately one hour elapsed before Sgt. Morrison located the vehicle in question in the parking lot of a McDonald's restaurant in the 400-block of Penn Avenue. (PHT at p9-10).

c. When Sgt. Morrison was able to enter the McDonald's parking lot the vehicle in question had been legally parked and Mr. Robinson was located inside the restaurant at the counter. (PHT at p10-11).

d. Sgt. Morrison then confirmed the vehicle he observed was the same as that from their previous encounter with Mr. Robinson and requested Ofc. Duncan to come to his location. (PHT at p11).

e. The officers then decided that rather then enter the restaurant and apprehend Mr. Robinson, they would wait for him to exit the restaurant and Ofc. Duncan would attempt to block Mr. Robinson's vehicle from exit, as his patrol car was equipped with a push bar. (PHT at p12).

f. When Mr. Robinson exited the restaurant, he entered his vehicle as Ofc. Duncan approached and exited his patrol car. (PHT at p13).

g. Mr. Robinson then attempted to exit the parking space his vehicle occupied, and struck Ofc. Duncan's unoccupied patrol car with the rear of the vehicle he occupied. (PHT at p14).

h. Mr. Robinson then pulled forward and shifted back into reverse. At this point in time, Sgt. Morrison testified that himself and Ofc. Duncan were behind Mr. Robinson's vehicle, and as the vehicle reversed, Sgt. Morrison fired a single round into the vehicle and Ofc. Duncan fired at least two. (PHT at p16-17).

i. This stands in stark contrast to Ofc. Duncan's account of this second encounter

Respondents' Exhibit 18

with police during his post-incident interview with Allegheny County Police Homicide Detectives. Ofc. Duncan recounted that before Mr. Robinson exited the parking spot, he fired his service weapon "towards the driver's side window." (Interview Transcript at p10-11, Defense Exhibit C).

j.  Ofc. Duncan further recounted that following the shots fired by himself and Sgt. Morrison, Mr. Robinson fled from the parking lot. (IT at p13-14).

k.  Sgt. Morrison's testimony is also in conflict with the medical evidence as shown in the photographs of the Defendant's wounds (entered into evidence on July 11, 2019).

l.  Furthermore, the medical reports of the surgery performed on the Defendant trace the path of the bullet through his left arm and entering the left side of the chest. (see pages 106-112 of Defendant's medical records from UPMC, Defense Exhibit D)

m.  Mr. Robinson was then able to exit the parking space he occupied and continued onto Penn Avenue, towards the City of Pittsburgh. (PHT at p18).

n.  Approximately three blocks down Penn Avenue, Mr. Robinson struck a utility pole and he exited the vehicle. (PHT at p18).

o.  Mr. Robinson was apprehended nearby, and the Allegheny County Police Department responded to process the scene and investigate the officer-involved shooting. (PHT at p18, p34-35).

DISMISSAL ANALYISIS:

Recounting the second encounter with Mr. Robinson, Sgt. Morrison testified that

Respondents' Exhibit 18

himself and Ofc. Duncan were behind Mr. Robinson's vehicle, and as the vehicle reversed, Sgt. Morrison fired a single round into the vehicle and Ofc. Duncan fired at least two. NT at 16-17. This stands in stark contrast to Ofc. Duncan's account of this second encounter with police during his post-incident interview with Allegheny County Police Homicide Detectives. Ofc. Duncan recounted that before Mr. Robinson exited the parking spot, he fired his service weapon "towards the driver's side window." IT at 10-11.

It is Mr. Robinson's contention that the assertions contained within the affidavit of probable cause—that Ofc. Duncan and Sgt. Morrison discharged their service weapons at his vehicle because they were in fear for their lives and the lives of others—is the product of misrepresentations by the officers as to their locations in respect to the vehicle during this second encounter. Mr. Robinson bases his request to challenge the veracity of information contained within the affidavit of probable cause on the basis that, akin to the ability of a defendant to challenge the veracity of statements on the face of a warrant application in a pretrial suppression hearing, the same opportunity must be afforded when a criminal defendant challenges the veracity of a criminal complaint. *See Commonwealth v. Hall*, 302 A.2d 342, 344 (Pa. 1973) (explaining that "the right of a defendant to challenge the veracity of facts recited in a warrant is Not [sic] premised on an assumption of perjury by law enforcement officials").

The Court in *Hall* makes clear that "the right to challenge the truthfulness of recitals in a warrant follows from the command of Aguilar-Spinelli that the magistrate make a 'detached and objective determination' of probable cause," for "[i]f a magistrate is furnished, and reviews falsified averments, he is effectively precluded from making a detached and objective determination." *Id.* (internal citations omitted). Further, in reviewing the applicability of *Hall* in a subsequent proceeding, the Court made clear that while the Fourth Amendment requires that

Respondents' Exhibit 18

allegations of falsehood or disregard for the truth must be accompanied by an offer of proof, no such showing is required by Pennsylvania law: "In *Hall*, we established as a matter of state law, that a defendant is entitled to make an inquiry into the veracity of statements included in an affidavit supporting the warrant without conditioning the right upon a 'substantial preliminary showing' of the potential falsity of those facts." *Commonwealth v. Miller*, 518 A.2d 1187, 1194 (Pa. 1986).

While Hall and Miller do indeed address the veracity of averments in the affidavit of probable cause underlying a search warrant, and not those contained within a criminal complaint, the principles announced by those decisions must apply equally to both documents. In authorizing inquiry into the veracity of statements in a pretrial setting, the Court sought to afford defendants a meaningful opportunity to examine the allegations presented against them—if a warrant application could not be challenged after its authorization by a magistrate, any falsity contained therein, unknown to the magistrate, would stand immune from attack. This naturally extends to the determinations of a magistrate based upon the affidavit of probable cause and testimony presented to them at a preliminary hearing. If the magistrate is furnished with false or inaccurate information that is used to aid in his determination that the Commonwealth has alleged a sufficient factual basis for a defendant to be bound over for trial, denying the defendant the ability to explore such possibility pretrial would provide the Commonwealth the same immunity as an inaccurate warrant application.

Because the commands of the Pennsylvania Supreme Court with respect to a defendant's ability to explore the veracity of a warrant executed against him apply in equal force to allegations within a criminal complaint, Mr. Robinson is entitled to a pretrial hearing in order to afford him an opportunity to ascertain the truthfulness of the assertions made against him.

Respondents' Exhibit 18

WHEREFORE, the Defendant, TODD ROBINSON, and defense counsel respectfully requests that this Honorable Court grant this Motion to Dismiss and dismiss all counts against the Defendant, due to the misrepresentations in the affidavit.

## III. MEMORANDUM IN SUPPORT OF MOTION TO SUPPRESS EVIDENCE

1.   The averments of paragraphs 1 through 9 under the heading of the Petition for Writ of Habeas Corpus are incorporated by reference hearing.

2.   Three issues were raised in the Motion to Suppress filed on April 8, 2019, and are as follows:

   a.   That the original encounter between the Defendant and the Wilkinsburg Police began as a welfare check, but then soon was raised to a seizure of the Defendant without reasonable suspicion that criminal activity was afoot, as evidenced by the Officers seizing the Defendant's driver's license and calling in to dispatch so that a criminal background check and check for warrants could be conducted.

   b.   That even during and after the second encounter with the police at McDonald's, no probable cause to search the vehicle existed, since the Defendant was wanted for a parole violation, and any search of the vehicle must be supported by separate probable cause.

   c.   That during the search of the vehicle following the arrest, upon discovery of a bag in the vehicle, the proper procedure for the police at that time would be to secure a

Respondents' Exhibit 18

second search warrant detailing the items to be seized, and without exigent circumstances, the failure to do so violated the Defendant's rights.

3.   At the preliminary hearing, the Commonwealth presented the testimony of two witnesses, Sergeant Matthew Morrison ("Sgt. Morrison"), a shift supervisor employed by the Wilkinsburg Police department, and Detective Anthony Perry ("Det. Perry") of the Allegheny County Police Department Homicide Unit.  The testimony at the preliminary hearing, as well as the post-incident interview of Officer Duncan by Allegheny County Police Homicide Detectives, established the following facts:

   a.   Sgt. Morrison explained that while he was checking the area of Taylor Way in Wilkinsburg for illegally parked vehicles, it was not necessary to make contact with Mr. Robinson to effectuate the parking ticket being issued. (Notes of Testimony, Preliminary Hearing, 07/20/2017 "PHT"), at Page 4, 19, 20.

   b.   Sgt. Morrison also explained why he decided to request backup and approach Mr. Robinson: "Wilkinsburg is generally a high-crime area. I'm sure you're aware of that. It was in a dark alley right next to a business, if you will. It's our common practice to check people that are sleeping in a vehicle for either the criminal aspect that they may be up to, or they may be intoxicated and sleeping, trying to sleep it off." PHT at p20.

   c.   Sgt. Morrison awaited the arrival of Ofc. Duncan before approaching the vehicle. PHT at p5, 20.

   d.   The officers then approached the vehicle, Ofc. Duncan on the driver's side and Sgt. Morrison on the passenger's side, and Ofc. Duncan tapped on the vehicle's window glass, awakening Mr. Robinson. PHT at p5.

   e.   Ofc. Duncan then immediately asked Mr. Robinson for identification, namely his

driver's license and vehicle registration. PHT at p 6, 21.

f.   Mr. Robinson's information was then "run" through County Index to determine the validity of his license, confirm vehicle ownership, and clarify whether any wants or warrants were outstanding. PHT at p6.

g.   After County Index advised that no outstanding warrants existed for Mr. Robinson, he was released from the scene. PHT at p8.

h.   The nature of the encounter that Sgt. Morrison and Ofc. Duncan had with Mr. Robinson, most notably his custodial status during the encounter, is made clear by the post-incident interview that Allegheny County Police Detectives conducted with Ofc. Duncan.

i.   During this interview, concerning their initial interactions with Mr. Robinson, Duncan stated "I automatically became a little suspicious, just because the alley he was parked in was illegal parking, um, the time of day, and he responded stating that he was there waiting for his cousin to open up an – an auto shop." ACPD Interview Transcript (DUNCAN) at Page 3.

j.   Duncan continued, discussing their investigation of Mr. Robinson, "Um, dispatch – they responded a few minutes later and said that, uh, the driver, he was negative on any wants or warrants. *At that time, we advised him he was free to leave.*" Id. (emphasis added).

SUPPRESSION ISSUE A: ANALYISIS:

There are three categories of police interactions which classify the level of intensity in which a police officer interacts with a citizen, and such are measured on a case by case basis.

"Traditionally, this Court has recognized three categories of encounters

Respondents' Exhibit 18

between citizens and the police. These categories include (1) a mere encounter, (2) an investigative detention, and (3) custodial detentions. The first of these, a "mere encounter" (or request for information), which need not be supported by any level of suspicion, but carries no official compulsion to stop or to respond. The second, an "investigative detention" must be supported by reasonable suspicion; it subjects a suspect to a stop and a period of detention, but does not involve such coercive conditions as to constitute the functional equivalent of an arrest. Finally, an arrest or "custodial detention" must be supported by probable cause."

*Commonwealth v. Collins*, 950 A.2d 1041, 1046-1047 (Pa. Super. Ct. 2008) (citing *Commonwealth v. Mendenhall*, 715 A.2d 1117, 1119 (Pa. 1998)). The analysis of the distinction between mere encounter and investigative detention is challenging when officers do not indicate that the individual is not free to leave, the individual is not restricted in his movement, and the citizen does not attempt to leave. *Commonwealth v. Jones*, 378 A.2d 835, 840 (Pa. 1977).

The *Collins* court explained that "the focal point of our inquiry must be whether, considering the circumstances surrounding the incident, a reasonable person innocent of any crime, would have thought he was being restrained had he been in the defendant's shoes." 950 A.2d at 1046-1047 (citing *Commonwealth v. Reppert*, 814 A.2d 1196, 1201-1202, (Pa. Super. Ct. 2002); see also *Jones*, 378 A.2d at 840 (stating that the totality of circumstances must be evaluated). Additionally, the court provided a non-exhaustive list of factors to assist in differentiating between mere encounter and investigatory detention:

> [T]he number of officers present during the interaction; whether the officer informs the citizen they are suspected of criminal activity; the officer's demeanor and tone of voice; the location and timing of the interaction; the visible presence of weapons on the officer; and the questions asked. Otherwise inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person.

Id. at 1047.

It must be stressed that, "the combination of the threatening presence of several officers

and the indication that appellant was suspected of criminal activity [requires the conclusion that] a reasonable person would believe that he was not free to leave." *Commonwealth v. Parker*, 161 A.3d 357, 363 (Pa. Super. Ct. 2017).

In support of the Commonwealth's assertion that Mr. Robinson was not subjected to an investigative detention, they offer *Commonwealth v. Au*, 42 A.3d 1002 (Pa. 2012) as instructive as to whether a request for identification from a parked motorist constitutes an investigative detention. *See* Commonwealth's Response to Defense Motion, Motion to Suppress, ("Cmw. Res.") at Paragraphs 7-9. However, the Commonwealth's reliance on *Au* in the instant matter is misplaced. The Court in *Au* was tasked with determining whether an investigative detention had occurred where a police officer approached a vehicle parked in a business parking lot in the early morning hours, asked for identification from a passenger, and almost immediately discovered marijuana in plain view when the passenger opened the glove box to retrieve their identification. *Au*, 42 A.3d at 1003-04. Ultimately, the Court determined that by itself "a request for identification is not to be regarded as escalatory in terms of the coercive aspects of a police-citizen encounter," and that because the officer did not "activate the emergency lights on his vehicle, position his vehicle so as to block the car that appellee was seated in from exiting the parking lot, brandish his weapon, make an intimidating movement or overwhelming show of force, make a threat or command, or speak in an authoritative tone," no seizure had occurred. *Id.* at 1007-08.

Importantly, the Commonwealth overlooks that in the instant matter, more than a request for identification occurred—far more instructive to the at issue encounter is *Commonwealth v. Hudson*, 995 A.2d 1253 (Pa. Super. 2010). In *Hudson*, an officer on

Respondents' Exhibit 18

routine patrol passed an intersection multiple times, each time observing Mr. Hudson notice the police vehicle and enter a nearby grocery store. *Id.* at 1255. The officer stopped to speak with Mr. Hudson and another male, asked the two men whether they had identification, and ran an NCIC check for warrants on both individuals. *Id.* When the second male was returned as negative for warrants, he was advised that he was free to leave; Hudson was placed into custody for an outstanding warrant and searched incident to arrest yielding the contraband he sought suppression of. *Id.* Hudson was convicted of various drug offenses and presented the following claim for appellate review:

> Where the police officer did not observe any evidence of criminal activity and did not have reasonable suspicion to stop or detain [Hudson], did the trial court err when it determined that taking and keeping [Hudson's] identification until he was cleared of any outstanding warrants was not an investigative detention but a mere encounter not requiring reasonable suspicion and therefore not requiring suppression of the contraband subsequently found on [Hudson]?

*Id.* at 1255-56.

The Commonwealth contended that no facts present would support the conclusion that the interaction escalated from a mere encounter to an investigative detention—pointing out that Hudson was not informed that he was suspected of criminal activity and that the movement of Hudson and his companion were not restricted. *Id.* at 1256-57.

In reviewing the competing claims of the Commonwealth and Hudson, the Superior Court noted that the officer approached and asked the men for the identification, but at no time informed them that they were free to decline this request or leave the scene. *Id.* at 1258. Ultimately, the court concluded that viewing the record in the light most favorable to the Commonwealth, "Officer Gonzalez effectuated an investigative detention of Hudson at the time that Officer Gonzalez took and maintained possession of Hudson's identification. In such a situation, ***no reasonable person would have felt free to terminate***

Respondents' Exhibit 18

*the encounter and depart the scene.*"

Mr. Robinson was subjected to an illegal investigatory detention when, after determining that he was not in distress or in need of police assistance, the Wilkinsburg police requested and then retained possession of his driver's license in order to conduct an NCIC check for active warrants. Mr. Robinson's position is strikingly akin to that of Hudson above—not only in the similarity of the license retention and NCIC check not supported by reasonable suspicion of criminal activity, but too in the fact that after this check was completed, Mr. Robinson was advised by Ofc. Duncan that he was free to leave as the companion of Mr. Hudson was. Surely, if the police were not subjecting Mr. Robinson to their custody, they would not have informed him that after the NCIC check was completed that he was free to leave. Mr. Robinson, nor any reasonable person under the circumstances, would have felt free to terminate this encounter and depart the scene while the police retained possession of his identification.

WHEREFORE, because Mr. Robinson was subjected to an investigatory detention that was not supported by reasonable suspicion of criminal activity, all evidence obtained as a result of this unlawful encounter, including the discovery of Mr. Robinson's status as a fugitive and all items seized from the vehicle in question, must be suppressed as it constitutes fruit of the poisonous tree, stemming from his unlawful detention.

SUPPRESSION ISSUE B:  ANALYSIS:

The second encounter with the Defendant at the McDonald's was problematic, given the fact that had the Officers stopped the Defendant without putting him in fear of

Respondents' Exhibit 18

death or serious bodily injury, the Defendant would have simply been placed under arrest for a probation violation, and there would be no need to search the vehicle he was operating. The Defendant did have an expectation of privacy in the vehicle that he was permitted to operate by the owner.

The Hyundai would have been legally parked, and not in an unsafe condition, which would have allowed the owner of the vehicle, or the Defendant, the opportunity to have the vehicle towed (see 75 Pa.C.S. § 3352, Removal of Vehicle).

There would have been no probable cause to search the vehicle had the Defendant simply been placed under arrest in the parking lot.

That the subsequent flight, car crash, and gathering of evidence inside the car, are "fruit of the poisonous tree" created by Officer Duncan's actions, and the Commonwealth should not be permitted to use any evidence gathered in the Hyundai after the crash. Officer Duncan created the dangerous situation, and any potential "exigent circumstances" though his own act of shooting the Defendant prior to his driving away from the McDonald's.

Flight and use of force in self-protection from unlawful use of force by police officers is recognized to be lawful under certain circumstances in the Commonwealth of Pennsylvania—"an arrestee's use of self protection [sic] is justified when the arrestee reasonably believes that such force is immediately necessary to protect against an arresting officer's use of deadly force, i.e. force which is readily capable of causing death or serious bodily injury." *Commonwealth v. French*, 611 A.2d 175, 179 (Pa. 1992).

The officers here first encountered Mr. Robinson in the 1000 block of Taylor Way and described him as compliant during that encounter from which he was released. This first

Respondents' Exhibit 18

encounter eventually led to these officers learning that Mr. Robinson was wanted on an active homicide parole warrant and was known to be violent with police. When the officers found Mr. Robinson at the McDonald's restaurant, this information as to his violent nature clouded their judgement in determining how to affect his apprehension. Had the officers stopped Mr. Robinson without putting him in fear of death or serious bodily injury, he would have been placed under arrest for a probation violation, and there would have been no need to search the vehicle he was operating.

SUPPRESSION ISSUE C:  ANALYSIS

At some point in time following Mr. Robinson's apprehension, a search warrant was secured for the vehicle Mr. Robinson had been driving—this warrant was devoid of any particularized description of the property that was to be seized. The firearm in question here was discovered pursuant to the execution of the above search warrant, which in no way provided any description, even generally, of the items for which probable cause existed to be seized at the time of application.

The particularity requirements of the Fourth Amendment to the United States Constitution make "general searches . . . impossible and prevents the seizure of one thing under a warrant describing another. As to what is to be taken, nothing is left to the discretion of the officer executing the warrant." *Marron v. United States*, 275 U.S. 192, 196 (1927).

The Pennsylvania Constitution provides even greater protection in that "no warrant to search a place or to seize any person or things shall issue without describing them as nearly as may be, nor without probable cause." Pa. Const. Art. 1 § 8; Pa.R.Crim.P. Rule 205. This requirement clearly provides more protection than the Fourth Amendment to the United States

Respondents' Exhibit 18

Constitution which merely requires particularity in the description of items to be seized. *Commonwealth v. Grossman*, 555 A.2d 896, 899 (Pa. 1989) (citing *Commonwealth v. Reese*, 549 A.2d 909, 910 (Pa. 1988)).

This heightened standard places particularity above probable cause in the determination of a warrant's validity—"a warrant is invalid if it does not describe as clearly as possible those items for which there is probable cause to search." *Commonwealth v. Rega*, 933 A.2d 997, 1012 (Pa. 2007) (citing *Grossman, supra*).

In applying Pennsylvania's particularity requirements, the Superior Court has explained that even in situations where an overly broad warrant is obtained and then a second, more particularized warrant is secured, this second warrant cannot cure the overbreadth of the initial warrant when search has already begun to occur. *Commonwealth v. Green*, 204 A.3d 469, 481 (Pa. Super. 2019) (citing *Commonwealth v. Melvin*, 103 A.3d 1, 17 (Pa. Super. 2014).

Here, an overly broad warrant was secured and executed. A second warrant to cure this overbreadth was not even contemplated. Surely, where the vehicle being searched had been impounded and transported to Allegheny County Police Headquarters, a warrant specifically enumerating the bag and its contents within Mr. Robinson's vehicle could have been obtained as the vehicle had been secured and there was no risk of loss or destruction of evidence.

Respondents' Exhibit 18

143

WHEREFORE, the Defendant, TODD ROBINSON, and Defense counsel respectfully

requests that this Honorable Court suppress any and all items seized from the vehicle in question.

Respectfully submitted,

Patrick A. Sweeney
Trial Counsel
PA I.D. #79256
OFFICE OF THE PUBLIC DEFENDER
FIRM #227
400 COUNTY OFFICE BUILDING
542 FORBES AVENUE
PITTSBURGH, PA  15219
(412) 350-3033

cmb 7-22-19

---

## NOTICE OF SERVICE

The Public Defenders Office hand-delivered a true and correct copy of the foregoing motion to the

following:

1.    The Honorable RANDAL TODD

2.    Allegheny County Clerk of Courts

3.    Allegheny County District Attorney's Office

4.    Criminal Court Administrator

Date: _____

Respondents' Exhibit 18

144

COMMONWEALTH OF PENNSYLVANIA
COUNTY OF ALLEGHENY

* * *

COMMONWEALTH OF PENNSYLVANIA

versus

TODD ROBINSON                          CC#:  2017-08906


* * *


Verbatim record of audio/video-recorded statement of Officer
Duncan

* * *




PRESENT:


Officer Duncan
Detective Foley
Detective Dolfi








EXHIBIT
C

Respondents' Exhibit 18

1    DETECTIVE DOLFI:  And just like we said,

2    everything's audio and video -

3    DETECTIVE FOLEY:  Recorded in the room.

4    DETECTIVE DOLFI:  You didn't lock us in, did

5    you?

6    DETECTIVE FOLEY:  No.  Alright, I just filled

7    out our report today.  Alright, let's see… Okay, so it's

8    10:24, and… Alright, Chris Duncan, right?

9    OFFICER DUNCAN:  Yeah.

10    DETECTIVE FOLEY:  Alright, Chris, we brought you

11    in - Officer Duncan, we brought you in to, uh, go over the

12    incident that occurred 4-24-2017, 430 Penn Avenue, the

13    McDonalds lot, it started - the - the - we got involved, and,

14    um, around - well, the initial occurrence I guess was around

15    4:25am.  That morning.

16    OFFICER DUNCAN:  Yes.

17    DETECTIVE FOLEY:  So just tell us in your own

18    words what you remember about the incident.

19    OFFICER DUNCAN:  Okay, uh, well, the initial

20    incident, uh, Sergeant Morrison, he radioed myself and

21    dispatch advising that he was out in the thousand block of

22    Taylor Way with a, uh, male who was sleeping inside of a

23    vehicle.  Um, once I got there, uh, Sergeant Morrison pointed

24    out the vehicle and I observed the male in the driver's seat

25    sleeping.  Tapped on the window a few times, uh, once he

Respondents' Exhibit 18

146

1   responded, I requested his driver's license, which he gave me.

2   Uh, relayed the information to dispatch, and um, while waiting

3   for that information to come back, um, I asked the driver what

4   his reason was there.

5          Um, I automatically became a little suspicious,

6   just because the alley he was parked in was illegal parking,

7   um, the time of day, and he responded saying that he was there

8   waiting for his cousin to open up an - an auto show.  Um, my

9   knowledge is that most of those businesses don't open until

10  roughly eight o'clock in the morning.  Um, dispatch, they -

11  they responded a few minutes later and said that, uh, the

12  driver, he was negative on any wants or warrants.  At that

13  time, we advised him he was free to leave.

14         I'd say maybe within two to three minutes later,

15  after the driver left, um, dispatch, uh, advised us that that

16  male did have an active warrant out for a parole violation,

17  and they further went on to say that it was, um, it - it had

18  for, uh, robbery with a firearm, escape, um, I believe

19  propensity of violence towards police officers, uh, drug abuse

20  and… uh, I believe something with alcohol.  Uh, yeah, at that

21  time, me and Sergeant Morrison, we started to canvas the area,

22  um, and we - we did not see him until, uh, Sergeant Morrison

23  radioed me, I think it was around five-thirty.  Um, advising

24  myself and dispatch again that he was in the parking lot of

25  McDonalds, and he observed what he thought was the actor's

Respondents' Exhibit 18

1 | vehicle.

2 |        DETECTIVE FOLEY:  Okay.  Something I missed –

3 | what – what shift were you working that night?

4 |        OFFICER DUNCAN:  Oh, midnight to eight shift.

5 |        DETECTIVE FOLEY:  Okay.  And who all was

6 | working?

7 |        OFFICER DUNCAN:  Just me and Sergeant Morrison.

8 |        DETECTIVE FOLEY:  And what was your callsign

9 | that night?

10 |        OFFICER DUNCAN:  Uh, 4230.

11 |        DETECTIVE FOLEY:  And what would Sarge's be?

12 |        OFFICER DUNCAN:  Uh, 4204.

13 |        DETECTIVE FOLEY:  Okay… So, you said around

14 | 5:30, Sergeant radioed you, said he found the car –

15 |        OFFICER DUNCAN:  Yeah.

16 |        DETECTIVE FOLEY:  – that he sees the car?

17 |        OFFICER DUNCAN:  He radioed me and, um, stated

18 | that he, uh, his exact words were, um, I – I believe we're out

19 | with your – you know, with your boy, um, you know, in

20 | reference to the thousand block of Taylor Way.

21 |        DETECTIVE FOLEY:  And that was where?

22 |        OFFICER DUNCAN:  Uh, the McDonalds parking lot.

23 | The, uh, the front entrance.  Um, he — the driver wasn't in

24 | the car.  We observed him inside the McDonalds standing in

25 | line.

Respondents' Exhibit 18

1    DETECTIVE FOLEY:  Okay, that's Penn Avenue

2 McDonalds?

3    OFFICER DUNCAN:  Yes, I - I think the address is

4 408 Penn Avenue.

5    DETECTIVE FOLEY:  Yeah, we have - I don't know

6 if this is correct, 430 Penn Avenue.

7    OFFICER DUNCAN:  It may - yeah, it may be, I

8 always get that and Get Go's, um, addresses mixed up.  It's

9 one of those two.

10    DETECTIVE FOLEY:  So it's right at Pennwood and

11 Penn?

12    OFFICER DUNCAN:  Yes.

13    DETECTIVE FOLEY:  Okay.  So you pull up, you

14 meet the Sergeant at McDonalds.  And where is the actor at

15 that point?

16    OFFICER DUNCAN:  He's inside the - the store in

17 line.  I think, uh, it looked like he had just maybe purchased

18 a coffee or something.  But he was still standing in line.

19 Uh, there were a few people, uh, I believe in front of him.

20    DETECTIVE FOLEY:  Okay.  Alright, so what did

21 you guys do at that point?

22    OFFICER DUNCAN:  Um, at that time, we - we

23 started to talk just because of, uh, the information that we

24 received from dispatch, with our knowledge that he was now in

25 there and that there were people inside.  Um, we tried to

Respondents' Exhibit 18

1   kinda plan the best way to actually, um, take him into

2   custody, and we agreed that we would wait until he left the

3   store.

4               DETECTIVE FOLEY:  Okay.  So the information, it

5   - uh, we don't need it verbatim, but essentially what did you...

6   like what kind of person were you looking for?  I mean what -

7   what did they tell you about him?

8               OFFICER DUNCAN:  Oh, they - they told us that,

9   um, his parole - he was on parole violation, uh, it - it

10  included, uh, a murder, uh, well, homicide.  Um, propensity of

11  violence toward police officers, uh, escape.  Uh, robbery with

12  a firearm, and, um, drug - drug abuse.

13              DETECTIVE FOLEY:  Okay.  So that - that led to -

14  you guys didn't want to encounter him in the store?

15              OFFICER DUNCAN:  Exactly, and - and even before

16  that happened, um, like I told Sergeant Morrison, I already

17  had suspicion, um, just based off of, you know, him, and - and

18  him being in the alley, and - and I also - and I don't know if

19  this is important, but I observed him, um, during the four

20  o'clock hour, he didn't have any shoes on.  Um, but just - my

21  suspicions were raised, uh, from our initial encounter in

22  Taylor Way.

23              DETECTIVE FOLEY:  Okay.  Alright, so what - what

24  plan do you guys come up with while you're, uh, you're

25  watching him in the store?

Respondents' Exhibit 18

1          OFFICER DUNCAN:  We - we just - we agreed that
2 we were gonna wait until he actually left, um, so if he
3 started to - to walk out, I pulled my patrol vehicle up with
4 my lights activated, and, um, my window was down, and I looked
5 at him and - and said several times, sir, we need to speak
6 with you.  Uh, I believe it was - it was two or three times
7 that I've actually said to him.

8          DETECTIVE FOLEY:  Okay, when you say lights
9 activated, headlights or flashing lights?

10          OFFICER DUNCAN:  Flashing lights.

11          DETECTIVE FOLEY:  Okay.  So you pull up in a
12 marked police unit - or marked police unit with your flashing
13 lights on.

14          OFFICER DUNCAN:  Yes.

15          DETECTIVE FOLEY:  Okay.

16          OFFICER DUNCAN:  And stated several times, um,
17 sir, we need to speak with you.

18          DETECTIVE DOLFI:  Is he still outside of his car
19 at that point?

20          OFFICER DUNCAN:  Yeah.

21          DETECTIVE DOLFI:  When you're telling - okay.

22          DETECTIVE FOLEY:  Okay, what's he do at that
23 point?

24          OFFICER DUNCAN:  Uh, he made direct eye contact
25 with me, and then like a few sec- within a matter of seconds,

Respondents' Exhibit 18

1   he hurried up to his car.  To - he got in the, uh, driver's

2   side of his car, and then I hurried up and exited my car.

3   And, um, he closed the door, but he hadn't closed it all the

4   way, um, and - and my hand was kind of on his driver's side

5   door, and his window - his car window was down.

6                    DETECTIVE FOLEY:  Okay.  So you - you're

7   obviously - you're out of your car at this point?

8                    OFFICER DUNCAN:  Yeah.

9                    DETECTIVE FOLEY:  How did you, uh, how did you

10  park your car?  Where did you park your car?

11                   OFFICER DUNCAN:  Uh, I parked it at - it was at

12  a - an angle with the, um, my front driver's side was, um,

13  partially behind the rear of his vehicle.

14                   DETECTIVE FOLEY:  Okay, so you're on an angle,

15  and you're blocking - if this is his car pulled in, this -

16  would this be the front of the store?

17                   OFFICER DUNCAN:  Yeah, the - let's say they -

18  that's the front of the store.  Um, the way I come in is my

19  car's kinda, um, like this.

20                   DETECTIVE FOLEY:  Okay.

21                   OFFICER DUNCAN:  So the front - my driver's side

22  is this way.  And, um, I'm partially blocking the, uh, rear of

23  his vehicle.

24                   DETECTIVE FOLEY:  Okay.  And what's going on at

25  this point, now?  You're out of the car?

Respondents' Exhibit 18

1      OFFICER DUNCAN:  Yes, my hand is on the door

2  because his - his car door hadn't closed all the way, it was -

3  it was pushed to, but it hadn't actually latched.  Um, and I

4  told him several times to get out of the vehicle.  He didn't

5  state it, he said okay, and he reached for his, uh - I guess

6  'cause his keys were in the ignition, so he motioned as if he

7  were going to turn his car off, um, and he kind of - he turned

8  towards me a little bit.  Um, at that time I thought he was

9  getting ready to comply.  Um…

10      DETECTIVE FOLEY:  And you're keeping a hand on

11  the car?

12      OFFICER DUNCAN:  My hand is on the door -

13      DETECTIVE FOLEY:  Okay.

14      OFFICER DUNCAN:  - uh, correct.

15      DETECTIVE FOLEY:  Okay.

16      OFFICER DUNCAN:  And then, um, he like - again,

17  within a matter of seconds, he reverses, and he takes me, um,

18  back with him into my patrol car, the uh, front end of my

19  patrol car.

20      DETECTIVE FOLEY:  Okay.

21      OFFICER DUNCAN:  And then, um, as soon as he

22  hits my patrol car, I let go.  Um, I'm flung a - a little bit.

23  Um, and then at that time, he - he drove forward, and he hit

24  the curb.  And then I believe there was a guardrail in the -

25  in the front of the store.

Respondents' Exhibit 18

1        DETECTIVE DOLFI:  Do you remember what kind of
2   motion your body made as you - as he was…
3        OFFICER DUNCAN:  Um, I don't -
4        DETECTIVE DOLFI:  And if you don't, it's okay.
5        OFFICER DUNCAN:  Yeah, I don't want to call it -
6        DETECTIVE DOLFI:  But you have your hand on his
7   car when he first went into reverse?
8        OFFICER DUNCAN:  Yes.
9        DETECTIVE DOLFI:  Okay.
10       DETECTIVE FOLEY:  So he goes reverse, strikes
11  your car, you're kind of thrown -
12       OFFICER DUNCAN:  Backwards.
13       DETECTIVE FOLEY:  - backward.  And now what does
14  he do?
15       OFFICER DUNCAN:  Um, after he drives forward, he
16  reverses again.  Uh, all this happened within a matter of
17  seconds, and he hits the front end of my car again.  Um, at
18  this time, I mean, I - I was in fear for my safety, I mean
19  this - this guy woulda did anything to, you know, get away,
20  even if that meant, you know, striking me, um, you know,
21  striking my sarge, and he - he just - he didn't care.
22       DETECTIVE FOLEY:  Um-hmm.
23       OFFICER DUNCAN:  Um, so after he - he hit it the
24  second time, um, I - I pulled out my - my firearm, and I
25  discharged, uh, one round, um, I believe it was towards the -

Respondents' Exhibit 18

1  the driver's side window.  Um, and then Sergeant Morrison, he

2  fired one round.

3           DETECTIVE FOLEY:  Okay, what happened next?

4           OFFICER DUNCAN:  And then, um, it - it struck me

5  as - as odd, because after that second round was fired, um,

6  this guy, he didn't - he didn't take off, uh, immediately, he

7  didn't flee, uh, immediately.  Um, and - and I thought again,

8  'cause my suspicions was maybe this guy had a gun in the car.

9  Um, so when he didn't flee, um, automatically, I thought this

10 guy was maybe - possibly loading something up in the car,

11 gettin' ready to, you know, fire back at us.  So I - I believe

12 it - and I'm terrible with, uh, estimated feet, but I wanna

13 say maybe within ten to fifteen feet, um, when he was in front

14 of me, I fired one additional shot at the rear of the vehicle,

15 and then that's when he - he fled from, uh, the parking lot.

16           DETECTIVE DOLFI:  Officer Duncan, when he

17 reversed that second time and struck your car again, did he,

18 um - was he pushing your car at all?

19           OFFICER DUNCAN:  I - again, I don't recall,

20 because the - the - the angle that I was at, Sergeant Morrison

21 would have had a better, um, look at that, 'cause he was a

22 little bit behind me, uh -

23           DETECTIVE DOLFI:  Okay.

24           OFFICER DUNCAN:  - so I honestly - I don't know

25 if he actually, you know, pushed the car.  I'm - I'm assuming

Respondents' Exhibit 18

1   he did, but I honestly could not tell you.

2                   DETECTIVE DOLFI:  Do you remember where you were

3   at when that car came backwards that second time?

4                   OFFICER DUNCAN:  Um, he was literally like a few

5   inches away from me the second time when he was –

6                   DETECTIVE DOLFI:  Okay, so real close to

7   striking you.  Okay.

8                   OFFICER DUNCAN:  Oh, yeah, he – yeah, he

9   definitely almost hit me with his vehicle.

10                  DETECTIVE FOLEY:  Now while this is going on,

11  the first time he hit your car, what are you saying to him?

12  What are you – are you – are you talking to him, are you

13  givin' him orders?

14                  OFFICER DUNCAN:  I didn't say anything the first

15  time this happened.  I heard Sergeant Morrison yell, um,

16  "stop, or I'll shoot."  I – again, I was kind of in shock.

17  Um, you know, when that happened.

18                  DETECTIVE FOLEY:  Okay.  And is the guy's window

19  down?

20                  OFFICER DUNCAN:  His driver's side window was

21  down the whole time.

22                  DETECTIVE FOLEY:  Okay.  Okay, and you say he –

23  he backs up, hits your car, maneuvers forward.  At what point

24  do you fire the first shot?

25                  OFFICER DUNCAN:  Um… I would – I would say, uh…

Respondents' Exhibit 18

1 I – I wanna say it was maybe a few – maybe a few seconds or so

2 after, um, I heard Sergeant Morrison say "stop, or I'll

3 shoot."

4          DETECTIVE FOLEY:  Okay.

5          OFFICER DUNCAN:  Um, I – I don't know if – you

6 know, I can't recall exactly how much time passed between that

7 and the time I actually fired the first shot.

8          DETECTIVE FOLEY:  So you fired two shots in

9 total?

10          OFFICER DUNCAN:  Yes.

11          DETECTIVE FOLEY:  Okay.  The second shot – what

12 part of the car would you say it – it hit?

13          OFFICER DUNCAN:  Um, it was the rear of the

14 vehicle.  Uh, I wanna say maybe somewhere around the – I – I

15 believe the trunk area, maybe?  Either the – the trunk or the

16 – the rear window.

17          DETECTIVE FOLEY:  Okay.  So you said he

18 hesitated, uh, and then he took off.

19          OFFICER DUNCAN:  Yes.

20          DETECTIVE FOLEY:  Okay.

21          OFFICER DUNCAN:  [INAUDIBLE] parking lot.  Right

22 down on Penn.

23          DETECTIVE FOLEY:  What – yeah, what do you

24 remember about that [INAUDIBLE]?

25          OFFICER DUNCAN:  Um, after he, uh, he took off

Respondents' Exhibit 18

1  down Penn, um, I immediately got in my car, and I began to

2  give chase.  Sergeant Morrison got in, and at that time,

3  Sergeant Morrison, uh, put out a description of the actor, um,

4  while we were driving down Penn, and I would say, uh, within

5  maybe two minutes or so, uh, we observed his car wrecked into

6  a pole.  Uh…

7                    DETECTIVE FOLEY:  Okay, now what direction on

8  Penn?

9                    OFFICER DUNCAN:  Uh, he was going west towards

10 the city.

11                   DETECTIVE FOLEY:  Okay.  And you're ahead of

12 Sergeant Morrison, vehicle-wise?

13                   OFFICER DUNCAN:  Yes.

14                   DETECTIVE FOLEY:  Okay, so you pull out, and

15 then where do you see his car wrecked?

16                   OFFICER DUNCAN:  Um, it was - he crashed into a

17 pole, I believe it was, uh, right just before you get to the

18 Peppi's, uh, restaurant.

19                   DETECTIVE FOLEY:  Okay.  Right at the Family

20 Dollar there?

21                   OFFICER DUNCAN:  Uh, yeah.

22                   DETECTIVE FOLEY:  Okay.  And what'd you - what'd

23 you notice about the car at that point?

24                   OFFICER DUNCAN:  Uh, I mean it was - it was just

25 totaled, it was, um… it was, you know, wrecked, he went

Respondents' Exhibit 18

15

1  straight into a pole.  But he wasn't in the car.  Uh, there

2  was a guy, um, he started stating that he ran this way, uh, in

3  the direction towards the rear of Family Dollar.  Uh, so I got

4  in my car and I radioed dispatch letting him know that I would

5  be on foot searching for him.  And, uh, I want to say maybe,

6  uh, three to five minutes later, I observed, uh, him.  He was

7  lying in the bushes, um, on the side of the, uh, Family

8  Dollar.

9              DETECTIVE FOLEY:  So you're driving around, or

10  are you walking around?

11              OFFICER DUNCAN:  No, I was — I was walking.  I

12  had already got — gotten out of my car and radioed dispatch

13  letting 'em know that I'd be on foot looking for him.

14              DETECTIVE FOLEY:  Uh, the whole time,

15  McDonald's, the alley, McDonald's, as he pulls away, anyone

16  else in the car?

17              OFFICER DUNCAN:  In his vehicle?

18              DETECTIVE FOLEY:  Yeah.

19              OFFICER DUNCAN:  No, no, just the guy.

20              DETECTIVE FOLEY:  Okay, he's the only one in the

21  car?

22              OFFICER DUNCAN:  Yeah.

23              DETECTIVE FOLEY:  Okay.  And did — are you the

24  one that found him, you — you saw him?

25              OFFICER DUNCAN:  Yes, I — I found him, I was the

1    first one there.  Uh, once I found him, um, I told -- I ordered
2    "let me see your hands, let me see your hands," and he stated
3    "I was shot."  And then at that point I got on the radio and
4    advised dispatch that he was shot and to send medics.
5                    DETECTIVE FOLEY:  But where was he when you
6    found him?
7                    OFFICER DUNCAN:  Uh, he was lying in - in the
8    set of bushes, uh, on the side of Family Dollar.
9                    DETECTIVE DOLFI:  Now did he show you his hands
10   at all, or was he -
11                   OFFICER DUNCAN:  No, he -
12                   DETECTIVE DOLFI:  - not in any condition to -
13                   OFFICER DUNCAN:  - yeah, he - he just kept
14   sayin' "I can't move my hand, I can't -"
15                   DETECTIVE DOLFI:  Okay.
16                   OFFICER DUNCAN:  "I can't move my hand."
17                   DETECTIVE DOLFI:  Now did you observe blood, I
18   mean, did you see -
19                   OFFICER DUNCAN:  I did.
20                   DETECTIVE DOLFI:  - tell that he was shot?
21                   OFFICER DUNCAN:  Yeah, I - I seen blood.
22                   DETECTIVE DOLFI:  Okay.
23                   OFFICER DUNCAN:  And then at that time, I, um…
24   and I put my firearm away, um, got in the - well, I put my
25   gloves on, and then got in the - in the bushes, and tried to,

1   you know, just to confirm that he, you know, he was shot.

2                    DETECTIVE DOLFI:  Yeah.

3                    OFFICER DUNCAN:  Um, and then at that time,

4   that's when I radioed dispatch letting them know that he was

5   back there and to have medics respond there.

6                    DETECTIVE FOLEY:  Did you cuff him?

7                    OFFICER DUNCAN:  I did.

8                    DETECTIVE FOLEY:  Okay.  Now was there help

9   there relatively quickly, other officers, other…?

10                    OFFICER DUNCAN:  Yeah, there was, uh – a couple

11  city officers, Edgewood, and Swissvale.

12                    DETECTIVE FOLEY:  Okay.  How about the medics?

13  Um, medics there a short – a short time later?

14                    OFFICER DUNCAN:  Yeah, um, I – I'd say maybe…

15  five or ten minutes later.

16                    DETECTIVE FOLEY:  And then they take over

17  treatment of him?

18                    OFFICER DUNCAN:  Yes.

19                    DETECTIVE FOLEY:  Did you guys find anything at

20  the scene there?

21                    OFFICER DUNCAN:  No, other than his, um, his

22  cell phone, um, we – we didn't – we didn't see anything else.

23                    DETECTIVE FOLEY:  Okay, and then, um, Sergeant

24  Morrison coordinates, uh… uh, watching the second scene, or

25  the first scene, McDonald's?

Respondents' Exhibit 18

1          OFFICER DUNCAN:  Yes, he –

2          DETECTIVE FOLEY:  With officers?

3          OFFICER DUNCAN:  – he had, um, I believe it was

4   a Swissvale unit.  They went back to the McDonald's and, um,

5   just to secure, and then I think they may – they may have

6   spoke with someone, I'm not completely sure, though.

7          DETECTIVE FOLEY:  And then his car is another

8   scene?

9          OFFICER DUNCAN:  Yes.

10         DETECTIVE FOLEY:  Okay.  Alright, anything else

11  you can think of?

12         OFFICER DUNCAN:  Um… no, I – I don't…  No,

13  there's – there's nothing else, I mean I – I tried to, you

14  know, recall, but that's exactly, you know, how it happened,

15  but other than that, no, there's nothing else I can think of.

16         DETECTIVE DOLFI:  You don't think –

17         DETECTIVE FOLEY:  So you worked the midnight to

18  eight shift last night, finishing up eight o'clock this

19  morning?

20         OFFICER DUNCAN:  Yes.

21         DETECTIVE FOLEY:  Okay.  And then went to

22  criminal court?

23         OFFICER DUNCAN:  Yeah.

24         DETECTIVE FOLEY:  Okay.  Alright, so we'll get

25  you out of here, let you get some rest.

Respondents' Exhibit 18

1            OFFICER DUNCAN:  Okay.

2            DETECTIVE FOLEY:  Alright, thank you for coming

3  in, and, uh -

4            OFFICER DUNCAN:  Oh, no problem, thank you.

5            DETECTIVE FOLEY:  - we'll talk to you - we'll

6  give you a call later today, I'll leave you a message -

7            OFFICER DUNCAN:  Okay.

8            DETECTIVE FOLEY:  Uh, for the hearing, the

9  hearing's tomorrow.

10           OFFICER DUNCAN:  Oh, yeah, that's - that's

11           DETECTIVE DOLFI:  Yeah, it starts -

12

13           [END OF RECORDING]




            I hereby certify that this is a true and

correct transcript of the proceedings in the above-entitled

matter.



     _____

     Chelsea Bodnar, Legal Secretary

     Allegheny County Office of the Public Defender

Respondents' Exhibit 18

UPMC – PRESBYTERIAN
PA

*** RADIOLOGY REPORT ***

Patient Name: ROBINSON, TODD A          DOB: ████████

MRN: 971056897            Gender: M      Location: EMEP (PUHSHY)

Patient Phone Number: 412-351-3548

Exam Desc: XRAY HUMERUS MINIMUM 2 VIEWS LEFT

                                        Collection Date: 04/24/2017 09:05
                                        Dictated on   :  04/24/2017 09:49

Attending MD:   THOMAS P MARTIN

Requesting MD:  THOMAS P MARTIN

Accession #: 84115546               Visit Number: 0251451277114

Attending Interpreter:      DON   WILLIAMS
Assisting Interpreter:

─────────────────────────────────────────────────────────────────
                    *** FINAL REPORT ***
Reason for the Exam:
LEVEL 1 GSW
PROCEDURE(S):
XRAY HUMERUS MINIMUM 2 VIEWS LEFT
CLINICAL HISTORY:
Age: 39 years . Gender: Male.
Stated history: " LEVEL 1 GSW" Additional history:  None.
TECHNIQUE:
2 views of the left humerus
COMPARISON:
None.
FINDINGS:
There is a large skin and soft tissue defect along the medial aspect
of the upper arm. A radiodense ribbon projects over this region with
multiple metallic clips. There are punctate foci of shrapnel in this
area.
No acute fractures or traumatic malalignment is appreciated in the
region of the left humerus.
IMPRESSION:
NO ACUTE FRACTURE OR TRAUMATIC MALALIGNMENT.
LARGE SKIN DEFECT WITHIN THE MEDIAL SOFT TISSUES OF THE LEFT UPPER
EXTREMITY. THIS IS BETTER APPRECIATED CLINICALLY.
PUNCTATE FOCI OF METALLIC DENSITY MAY REFLECT SHRAPNEL MATERIAL.
THERE ARE ALSO SURGICAL METALLIC CLIPS.
RELEVANT CLINICAL INFORMATION: LEVEL 1 GSW
Dictated by: DON  WILLIAMS
Signed by:  DON  WILLIAMS
Signed on: 04/24/2017 at 09:49 AM

                    <<< PAGE      1 >>>                **EXHIBIT**
                                                            D

Respondents' Exhibit 18

Facility: PUHSHY



**UPMC Presbyterian**
Presbyterian Hospital
Pittsburgh  PA    15213

Phone: (412) 647-1670        Fax: (412) 647-1669

Referred By:  WATSON, GREGORY        Phone:        CPT : 93971

Patient:  TODD A ROBINSON 39 MB
Acct/MRN:971056897 G080
Birth Date:
Phone:  (412)351-3548

---

## Upper Limb Venous Duplex Scan, unilateral                    Date: 5/1/2017

---

Mr. TODD A ROBINSON had a Upper Limb Venous Duplex Scan, unilateral on 5/1/2017. If you have any questions regarding this study please do not hesitate to contact us.
**Indications:**
Pain left arm [M79.602].
This 39 year-old male presents with left arm pain.

FINDINGS:

A venous duplex of the left upper extremity was performed from the jugular to the antecubital fossa level.  All venous structures examined were within normal limits.  There was good color filling, normal augmentation and compression at all levels. Please note that the proximal subclavian vein cannot be properly examined by a duplex scan.

IMPRESSION:  No evidence of DVT in the left upper extremity on this exam.


Mohammad H Eslami MD
Signed by Mohammad H Eslami MD on 2017-05-02 11:36:16 AM

Brian Kostrub, RVT
Signed by Brian Kostrub, RVT on 2017-05-01 11:15:18 AM

Respondents' Exhibit 18

UPMC Presbyterian
General Surgery
Operative Report

PATIENT NAME:  ROBINSON, TODD A
MRN:  971056897
ACCOUNT #:  0251451277114
ROOM #:  6GF/G619
DATE OF BIRTH:
SURGEON NAME:  JASON SPERRY
ATTENDING PHYSICIAN:  GREGORY WATSON
SURGERY DATE:  04/24/2017
ADMISSION DATE:  04/24/2017
DISCHARGE DATE:

PREOPERATIVE DIAGNOSIS:  Gunshot wound to left shoulder, left chest.

POSTOPERATIVE DIAGNOSIS:  Gunshot wound to left shoulder, left chest.

PROCEDURE:  Left chest tube placement, exploration of left axillary artery
and vein, repair of left axillary vein, proximal exploration of left
axillary artery, proximal arterial control, distal arterial control,
ligation of branches of the axillary artery and vein. Vascular will dictate
separate arterial bypass procedure. 3 compartment left forearm fasciotomies.
Creation of muscle flap/advancement flap of posterior upper arm to cover bypass
graft of left upper arm. Removal of foreign body from chest wall (bullet)

We initiated the procedure after the chest abdomen groin and neck were prepped
and draped in the usual standard trauma fashion.  A left chest tube was placed
and secured at 5th intercostal space while pressure was being held on the
axillae. We first made and incision over the medial upper arm over the humerus
and extended proximally to the left chest. we opened up some of the pectoralis
major and other muscle bellies and we followed the bullet tract to the chest
wall and removed the foreign body. We next exposed the distal axillary artery
and vein. We reparied a vein injury with 6-0 prolene, braches of the axillary
artery and vein were ligated. we placed a vascular clamp on the proxmial
axillary artery under direct vision and stopped major bleeding. We then went
proximal and got a vessel loop around it proxmially and also obtained distal
control of artery and vein. We called vascular surgery, Dr. Avergerinos, came to
assist. Vascular then came in and performed a vein bypass graft of the distal
left axillary artery to the brachial artery, which will be dictated under a
separate note.  Following their successful completion of arterial inflow to the
left arm via the brachial artery, we determined after about 4 hours since the
injury elected the patient required left forearm fasciotomies.
An incision was made in
the anterior surface of the forearm starting medially and sweeping
laterally on the radial side back towards the medial side, the ulnar side
of the forearm.  We were able to make skin flaps and then opened up the
large compartment, the anterior compartment of the forearm and mobile wad
comparment and deep compartment of the forearm. We then did a volar surface
incision and also opened up the fascia. There, we did 3 compartment
fasciotomies of the left forearm. The wound looked well.  We loosely
approximated the skin after we had opened up the fascial compartments.  We then
planned to cover the new venous bypass graft.  We were able to dissect muscular flaps of
both left upper arms.  We were able to dissect the subcutaneous tissue and the
muscle and we were able to approximate this muscle over the venous bypass graft.
Covering it totally, protecting it, we placed a 7-French JP drain in the
posterior shoulder tracking to the vascular bypass graft,  We then
reapproximated our incision, which was overlying the pectoralis major, all the
way down to the mid humerus and we closed the

Respondents' Exhibit 18

skin and subcutaneous tissue with staples over a Penrose drain and again with verified we had adequate hemostasis and reapproximating the dead space.  Patient tolerated the procedure well.  He had a palpable pulse in his left radial artery.  At the end of the case, his wound was hemostatic. Wet-to-dry dressings were placed in his forearm fasciotomy sites on the ventral and dorsal surfaces and sterile Kerlix was then placed after the wet-to-dry over it and we placed a sterile dressing over the axillary, brachial artery incision, which was closed over a Penrose.   The Penrose was sewed to itself.  The patient tolerated the procedure well.

I, Dr. Jason Sperry, was present for the entire case.  I scrubbed for all key portions dictated here.  Vascular Surgery would dictate a separate component for their venous bypass graft of the distal axillary artery/antebrachial artery.

_____
Electronically authenticated at end of document.

Dictated by:  Jason L. Sperry, M.D.

D:  04/24/2017 05:00PM, JLS T:  04/24/2017 11:32PM, hn
R:
Confirmation # 506536/ Document ID: 9954473
Electronically Authenticated and Edited by:
JASON L. SPERRY,  MD on 04/25/2017 09:05 AM EDT

Respondents' Exhibit 18

UPMC Presbyterian
General Surgery
Operative Report

PATIENT NAME:  ROBINSON, TODD A
MRN:  971056897
ACCOUNT #:  0251451277114
ROOM #:  8G/G0801
DATE OF BIRTH: ███████
SURGEON NAME:  BRIAN ZUCKERBRAUN
ATTENDING PHYSICIAN:  GREGORY WATSON
SURGERY DATE:  04/26/2017
ADMISSION DATE:  04/24/2017
DISCHARGE DATE:

TITLE OF OPERATION:  Closure of left arm wound.

SURGEON:  Brian Zuckerbraun, M.D.

INDICATIONS:  Mr. Robinson is a gentleman who was shot in the left arm who had fasciotomies of his left forearm.  These wounds were left open.

DESCRIPTION OF OPERATION:  Under general endotracheal anesthesia with the patient in supine position, after padding of all pressure points, his arm was prepped and draped in the usual sterile fashion.  It was irrigated, anterior wound was then partially closed with staples.  Closed suction drain was placed and this was further closed with staples on the dorsal aspect of his arm.  It was closed with 2-0 nylon interrupted vertical mattress sutures.  All sponge and needle counts were reported to be correct at the end of the operation.

ATTESTATION:  I was present for, scrubbed, and performed all portions of the operation as dictated above.

_____
Electronically authenticated at end of document.

Dictated by:  Brian S. Zuckerbraun, M.D.

D:  05/02/2017 06:29AM, BSZ T:  05/02/2017 02:57PM, hn
R:
Confirmation # 517335/ Document ID: 9989148
Electronically Authenticated by:
BRIAN ZUCKERBRAUN, MD on 05/04/2017 10:09 AM EDT

Respondents' Exhibit 18

UPMC Presbyterian
Vascular Surgery
Operative Report

PATIENT NAME:  ROBINSON, TODD A
MRN:  971056897
ACCOUNT #:  0251451277114
ROOM #:  6GF/G619
DATE OF BIRTH: ███████
SURGEON NAME:  EFTHIMIOS AVGERINOS
ATTENDING PHYSICIAN:  GREGORY WATSON
SURGERY DATE:  04/24/2017
ADMISSION DATE:  04/24/2017
DISCHARGE DATE:

SURGEON:  Efthimios Avgerinos, M.D.

ASSISTANT:  Andrew Leake, M.D.

PREOPERATIVE DIAGNOSIS:  Left upper extremity vascular injury.

POSTOPERATIVE DIAGNOSIS:  Left upper extremity vascular injury.

PROCEDURES:  Left proximal brachial artery reconstruction by interposition
of reverse basilic vein.  Basilic vein harvesting length 7 cm.

INDICATIONS FOR PROCEDURE:  Mr. Robinson Todd is a 39-year-old patient.
This was an intraoperative consultation by Dr. Sperry who had obtained
control by the time we got to the operating room.

DESCRIPTION OF PROCEDURE:  Dr Sperry had already looped the proximal brachial
artery and he had also placed a clamp at the more distal part of the incision ,
what seemed to be the brachial artery.  Some hemostasis was performed and we
then dissected the brachial artery injury area.  There was a partial transection
of the proximal brachial artery and after he obtaining proximal and more
distal control, I introduced a Fogarty 3 distally to make sure there was no
thrombus.  The Fogarty would not advance more than 2 cm, so at this point I
extended the incision further down in the bicipital groove and exposed a
lengthier segment of the brachial artery to realize that there was a bluish
portion of the brachial artery and potentially an intimal flap.  At this
point, I decided that I have to interpose the venous segment.  The brachial
artery was transected and the injured bruised portion was resected and sent
to Pathology.  Basilic vein was identified and was harvested for 7 cm.  It
was prepped and reversed.  5000 units of heparin were given and the basilic
vein was anastomosed at the proximal part of the brachial artery.  The end
result was hemostatic.  I then performed an end-to-side anastomosis to the
brachial artery.  The distal anastomosis was performed with a 6-0 Prolene
and the brachial stump was ligated.  The end result was satisfactory.  I
had an excellent flow through the basilic vein conduit and an excellent
radial pulse.  The trauma surgeons will dictate the rest portion of the
procedure that include fasciotomies.  Copious irrigation followed and the
patient tolerated the procedure well and returned to the Intensive Care
Unit in stable condition.

ATTESTATION STATEMENT:  This is Dr. Efthimios Avgerinos and I attest that I
was present throughout the whole procedure, directly performing or
supervising all key aspects.

---

Respondents' Exhibit 18

Electronically authenticated at end of document.

Dictated by:  Efthimios Avgerinos, MD

D:  04/24/2017 07:46PM, EA T:  04/25/2017 12:07AM, hn
R:
Confirmation # 511110/ Document ID: 9955280
Electronically Authenticated and Edited by:
Efthymios D Avgerinos, MD on 04/25/2017 12:03 PM EDT

Respondents' Exhibit 18

170

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA                    CRIMINAL DIVISION

                  v.                    CC: 2017-08906

TODD ROBINSON                                    JUDGE RANDAL TODD
      DEFENDANT

                                         Trial/Status Date:  August 15, 2019

## CERTIFICATE OF COMPLIANCE

I certify that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Respectfully Submitted:

PATRICK SWEENEY
TRIAL COUNSEL
PA I.D.# 79256
OFFICE OF THE PUBLIC DEFENDER
FIRM# 227
542 FORBES AVENUE
PITTSBURGH, PA  15219
(412) 350-3033

Respondents' Exhibit 18